UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ERIC CARLYLE DEAN and
ELIZABETH DEAN,

                            Case Number: 04-10120-BC

         Plaintiff,            Honorable David M. Lawson

v.

CITY OF BAY CITY, ROBERT V. BELLEMAN
and JAMES PALENICK,

         Defendants,
_____/

**OPINION AND ORDER GRANTING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Eric Carlyle Dean was employed for three-and-a-half years as the director of Bay City's electric department. He claims that his termination was unlawful and gave rise to several state law and federal causes of action. Plaintiff Elizabeth Dean, Eric's wife, joins in the state law claims alleging loss of consortium. The defendants have filed motions for summary judgment as to all the claims by both plaintiffs. The Court heard oral argument on the motions on December 20, 2005 and now finds that there is no genuine issue of material fact as to the plaintiff's federal claims, and the defendants are entitled to a judgment of dismissal as a matter of law. The Court will not retain supplemental jurisdiction over the remaining state law claims, which will be dismissed without prejudice.

I.

Eric Dean was hired as the City of Bay City's director of the electric department on July 10, 2000. At the time the plaintiff began his employment, James Palenick served as city manager, and Dean reported directly to him. Palenick became dissatisfied with Dean's performance, and in July

2002, Palenick authored a critical evaluation of Dean's performance, which concluded with a recommendation of termination. However, before the City acted on that recommendation, Palenick himself was fired; Robert Bellman replaced him as city manager. Bellman reviewed the plaintiff's job performance, presented written questions about his concerns for the plaintiff to answer, and eventually decided, like his predecessor, to fire the plaintiff. The termination became final on November 21, 2003.

Dean contends that the termination violated his rights under the Due Process Clause because the pre- and post-termination procedures were constitutionally inadequate. He also contends that he was fired in retaliation for speaking out on matters of public concern in violation of the First Amendment. Dean advances these claims via 42 U.S.C. § 1983. The complaint contains a state law breach of contract claim based on Dean's assertion that he could be terminated only for just cause, which, he says, did not exist. Apparently, Palenick suspected that Dean abused alcohol or prescription drugs on the job, so he hired an investigator to monitor Dean's activities. Dean contends that this investigation and the events that preceded his actual termination were illegal and give rise to various state law claims, including defamation, intentional infliction of emotion distress, tortious interference, and violation of Michigan's Freedom of Information Act.

The record presented by the parties, but viewed in the light most favorable to Dean, discloses that the plaintiff had earned a Bachelor of Science degree in Civil Engineering and a Masters degree in Public Administration by the time he took the department head position in Bay City. Prior to his employment with the City, the plaintiff worked in administrative and engineering capacities for power companies in North Carolina and Mississippi.

-2-

When the plaintiff was hired, he asked Palenick for a written employment agreement. Palenick explained at his deposition that the City did not conduct business in that fashion, since Bay City "did not have written employment agreements with anyone other than the city manager at the time." Pl.'s Resp. Br., Palenick dep. at 16. Palenick further stated that department heads "fundamentally . . . were at-will employees, but I think fairness would dictate that you would only terminate people for cause." *Id.* at 17. However, the plaintiff testified at his deposition that he believed his termination was subject to a "good cause" standard. He stated that "I was advised by Mr. Palenick, that is an individual I can recall specifically numerous occasions both one on one and in staff meetings that the only at will employee with the City was him and everyone else was just cause." Pl.'s Resp. Br., Dean dep. at 11. Based on his conversation with his supervisor, "I knew . . . I was a just cause employee" as that term was "defined by my supervisor." *Ibid.*

At the time of the plaintiff's hiring, the City maintained an employment procedure manual known as the Brown Book. That manual contained a list of work rules, which included a description of prohibited conduct that could result in various levels of discipline including termination. Certain offenses called for "mandatory dismissal" and others allowed for "discretionary dismissal." The manual also provided a grievance procedure that progressed through stages culminating in a hearing before the city commission. The grievance procedure subsequently was amended on November 18, 2002 by a city commission resolution. Dean was present at the meeting when the commission adopted the resolution, which provided for an abbreviated grievance procedure that was followed by elective arbitration. All of these provisions fortified the plaintiff's view that he could not be discharged from employment without proper cause.

During the plaintiff's employment tenure, certain city officials suspected that he abused prescription medications and alcohol. Based on the plaintiff's deposition testimony, these suspicions appear to have been well-founded. The plaintiff testified that he has long struggled with an alcohol problem:

> Q.   The first time you noticed an alcohol problem was at or near around the time of your divorce in 1986, '87?
> A.   It was during the divorce. Well, it was actually – it actually came on prior to the divorce, I mean you could see what was coming. I knew what was coming. It was hell at home. You know, when you're in situations like that you tend to follow the path of least resistance.

Dean dep. at 653. The plaintiff stated that when he first came to Bay City, he drank "more than three times a week." *Id.* at 664. On July 28, 2000, some eighteen days after he was hired, the plaintiff was arrested for drunken driving. He testified that his drinking worsened in 2002 when Palenick "was beginning to get in trouble with the Commission. And Jim chose to hold me responsible for those problems." Dean dep. at 668. The plaintiff moved more to hard liquor and was drinking five or six nights per week.

The plaintiff also took prescription drugs. In November 2001, the plaintiff underwent gastric bypass surgery and was prescribed Vicodin for pain by Dr. Janet Guisinger. The plaintiff's medical records state that he "had been taking 2 Vicodin extra strength  5 x a day. Surgeon will no longer refill it." Palenick Mot. Summ. J. Ex J., Dr. Guisinger Records. Apparently, the bypass "wound did not heal well, apparent signs of infection, two gaping regions." *Ibid.* Dr. Guisinger noted that the plaintiff could continue to take Vicodin, but "no more than 2 tablets 4 x a day." *Ibid.*

In March 2002, Dr. Guisinger diagnosed the plaintiff with back pain, peripheral neuropathy, foot pain, and depression, and prescribed Vicodin, Prozac, Xanax, and Neurotin. In May 2002, the

plaintiff reported that he was again taking Vicodin five times per day.  On May 12, 2002, the plaintiff underwent corrective eye surgery.  He again was prescribed Vicodin for the pain.

On May 30, 2002, Dr. Guisinger referred the plaintiff to the Bay Regional Medical Center, Pain Management Center for treatment of longstanding foot pain.  The consultation notes indicated that the plaintiff had been on pain medication since 1999, and presently the plaintiff received Vicodin "from different physicians.  However one of them was an Emergency Room physician and the other was the ophthamalic surgeon . . . who performed surgery for his eyes.  The patient states that he was not aware of the rules of informing the primary care physician when he receives a prescription from a different source."  Palenick Mot. Summ. J. Ex. K, Bay Medical Consultation. As a result of the consultation, the plaintiff was given a prescription for ten fentanyl patches with no refills.

On July 22, 2002, the plaintiff fractured his clavicle.  Again he was prescribed Vicodin for the pain.  The plaintiff's misuse of pain medication became so extensive that he was admitted to the Bay Medical Emergency Room on September 10, 2002, after he was "found in his lazy boy by his wife" and had "stopped breathing and turned blue." Palenick Mot. Summ.  J.  Ex.  L, Emergency Services Reports.  The diagnosis was "[a]cute overdose of fentanyl (Duragesic)." The plaintiff told doctors that "he cut the fentanyl packs open and drank the contents of each pack." *Ibid.*

In April of 2003, the plaintiff fractured his hip and was prescribed Oxycontin.  The Oxycontin landed the plaintiff in the emergency room for a second time.  His chief complaint was "possible overdose."  The plaintiff was administered Narcan and was discharged.

At his deposition, the plaintiff explained that the pain medication "had damn near become a food group in my life.  And I was tired of it.  It was impairing my – everything about my life."

Dean dep. at 758.  The plaintiff also admitted that he was drinking while he was taking the pain medications.  *Id.* at 749.  The plaintiff sought psychological counseling from Doctor Lawrence Harrellson during this period as well.  Dr. Harrellson noted that the plaintiff "described a long history of alcoholism with inpatient treatment for this problem several years ago." Palenick Mot. Summ. J. Ex. M, Dr. Harrellson Records. The plaintiff also appeared "to be quite dependent on Duragesic patches and Vicodin." *Ibid.*  Ultimately, the plaintiff says that he conducted a "self intervention" and has not had a drink since June of 2004.

Palenick stated in an affidavit that he became concerned about the plaintiff's "workplace sobriety after he returned to work in December of 2001 following a bariatric surgery." Palenick Reply Br. Ex. 1, Palenick aff. at ¶ 6.  Palenick "noticed a change in Eric Dean's demeanor, mental and physical characteristics at work." *Id.* at ¶ 7.  He summarized his observations of Dean's conduct as follows:

> 8.      During staff meetings and commission meetings, he displayed apparent problems with cognitive thinking, lucidity, and thought process.  I noted that his speech, at times, was slurred.  His responses to questions were slow and drawn, with gaps in his logic and reasoning.
>
> 9.      At commission and staff meetings, he appeared to doze in and out.  He responded to questions slowly with apparent synaptic gap.
>
> 10.     In 2002, I was approached by employees from Dean's department, who advised me of similar observations.  They noted that Dean dozed at his desk, slurred his speech, and was slow to respond to questioning.
>
> 11.     The look of Mr. Dean's workplace performance was likewise diminished. Numerous employees questioned his management abilities and expressed a lack of confidence in his operation of the department.  Budgetary problems and contractual problems surfaced.  He demonstrated a lack of direction and focus, and his decision making abilities were questioned by employees and colleagues. There were operational difficulties throughout his department.

12.    I suspected that some of these problems may be linked to the overuse of prescription medication due to Dean's recent medical history and physical condition for which he was treating.

13.    I suspected that alcohol may be a contributing factor due to my awareness of Mr. Dean's open and obvious alcohol use. I observed and was made aware of Mr. Dean's drinking habits, including drinking Monday evenings following commission meetings, drinking at employee golf outings, drinking at the department head's retreat, drinking at the city retreat with counselors, drinking at the city sponsored fireworks festival, drinking at the Mackinac Island MMEA Conference, drinking at the Cass Avenue Riverbore, drinking at the Schaeffer retirement party, drinking during meetings with Charter Communications and with Fishel and U.S. Fiber, and, of course, his previous OUIL arrest.

14.    The quantity of alcohol consumed by Mr. Dean at these and other work-related events and Plaintiff's inebriation at those events contributed to my concern regarding the potential.

*Id.* at ¶¶ 8-14.

Commissioner M.J. Gorney testified at her deposition that she knew of the plaintiff's substance abuse problems. She said the plaintiff told her he was having a problem with dependency on his pain medication.

Robert Bellman, Palenick's successor, feared that the plaintiff had a substance abuse problem. Bellman testified at his deposition that "[t]here was a time that I believed he was under the influence, and I did do a drug screen." Def.s' Mot. Summ. J., Bellman dep. at 33. To his knowledge, however, "it came back negative." *Ibid.*

Keith Miles, a senior manager with the City, testified that after the plaintiff's surgery in 2001, the plaintiff's behavior changed. According to Miles, the plaintiff was not enthusiastic, he made questionable decisions, he argued with co-workers, employees had to do his work, he nodded off during meetings, he did not provide adequate supervision and guidance to those under him, and his comments at staff meetings made little sense. Miles also stated that the plaintiff had confided

in him that the medications "were a problem after surgery. . . . And then we were just talking about things one day, and he told me that the pain pills were addictive, and that he had taken more than he probably should have." Def.s' Mot. Summ. J., Miles dep. at 49.

Predictably, the performance evaluations submitted by the defendants disclose that the plaintiff was a mediocre-to-poor department head. In the July 17, 2001 evaluation, Palenick commented that the plaintiff had an "[e]xcellent technical background," but at times the plaintiff had "strained relations with staff and City Manager based on communication (or lack of)." Def.'s Mot. Summ. J. Ex. 13, Evaluation (Jul. 17, 2001). Palenick believed that the plaintiff's written work-product was "good" but that there was "too much individual communication with City commissioners. The organization cannot effectively operate in that manner." *Ibid.* Palenick rated the plaintiff's decision making skills as satisfactory because although the plaintiff had "great potential," that potential was detracted by "personal zeal or cultural deficiencies or some other unknown motivation" that "seems to be clouding the decisions." *Ibid.* Palenick concluded that the plaintiff could be a "tremendous . . . asset to the team, but the team isn't yet who he plays for." *Ibid.*

Palenick's evaluation of the plaintiff one year later was less complimentary. On July 27, 2002, Palenick commented that the plaintiff "appears to profess knowledge [of his job], but results belie such professions." Pl.s' Resp. Br. Ex. E, Evaluation (Jul. 27, 2002). Palenick ranked the plaintiff's communication skills as unsatisfactory because the plaintiff was "self-serving in his zeal to undermine the City Manager [and] elevate himself." *Ibid.* The plaintiff scored an unsatisfactory rating in his ability to adapt and solve problems, quantity and dependability of effort, decision making skills, budget and cost control, sensitivity and cooperation, and attendance and availability.

-8-

However, the plaintiff earned the score of satisfactory for the quality and effectiveness of his effort. On a numerical scale, the plaintiff's quantitative performance was -6 out of thirty-three possible points, and Palenick recommended the plaintiff's termination. He concluded: "I sincerely do not believe Mr. Dean can adequately perform his duties at a level satisfactory to continued employment. His poor attendance; abysmal relationship with colleagues, employees, and vendors; lack of trustworthiness; poor decision making; and overall behavior is unacceptable." Def.s' Mot. Summ. J. Ex. 24, Performance Evaluation (Jul. 27, 2002).

The plaintiff contends that Palenick recommended his termination in retaliation because of Palenick's fear that Dean was positioning himself for Palenick's job, since Palenick apparently had fallen from favor. The plaintiff also believes that Palenick despised his socializing with Commissioner Rober Katt, who is now mayor. In fact, Katt testified at his deposition that he and the plaintiff had nicknames for each other: "Between the two of us, one of us – we were both big guys back then; I still am. So we said polar bear one, polar bear two." Pl.s' Resp. Br., Katt dep. at 49.

Following the evaluation, Palenick hired Steven Kerby of the Kerby Bailey investigation agency to conduct surveillance of the plaintiff. Palenick explained at his deposition that the investigator had two tasks: "Number 1, to complete a basic review of his background records, to check employment history, to check educational records, to check criminal record, to compare them to what we had first received from Little & Associates." Palenick dep. at 43. The second task was "to engage in some limited surveillance of Mr. Dean to see what he did in a typical day." *Ibid.* Palenick says he was concerned about whether the plaintiff was drinking or drunk on the job.

Palenick stated that he received only one report from the agency before he was terminated as city manager. Once discharged, Palenick testified that he "told Mr. Bellman of the existence of such investigation, because he was then named the acting city manager. And I felt that on the city's behalf, he needed to be aware of it." *Id.* at 44. Palenick further testified that he informed the human resource director and the City financial services director, Chris Ball, even before he was terminated. *Id.* at 44-45. Human resources was informed because the investigation "related directly to Mr. Dean's employment records" and Ball was informed because Palenick "had to provide for payment of the bills that would be coming through." *Ibid.* Palenick informed Ball and the agency of his suspicion that Dean was abusing alcohol during work. With respect to Ball, however, Palenick was unsure "if [he] would have gone into much specifics. His discussion and mine were about the finances of the matter." *Id.* at 46.

Ultimately, Ball and Palenick reached "a general consensus on what [fund] to use." *Ibid.* Palenick stated that the investigation was to be paid from "a fund that we had that was there to provide for payments related to workers comp issues, and/or issues related to employee health and/or injuries." *Ibid.* Palenick admitted that he did not run the idea by the City commissioners or the City attorney. Finally, Palenick chose to investigate the plaintiff over direct confrontation because "some of the responses I received from Mr. Dean in the past, I didn't necessarily believe I would get a trustworthy or credible response from him." *Id.* at 48.

After Palenick was fired, Bellman was made privy to Palenick's evaluation of the plaintiff. Thereafter, the plaintiff encountered criticism by the city commission and the press for a project he approved to bring electrical service to a commercial retail outlet. Bellman apparently continued to be concerned with the plaintiff's competence in his job, and on November 7, 2002, Bellman

-10-

presented the plaintiff with twenty-six question concerning his performance.  In the document,

Bellman wrote, "To more accurately complete your performance evaluation, I need to obtain

additional information.  Therefore, I would appreciate it if you could provide written, detailed

responses to the following issues.  Please attach any supporting documents."  Def.s' Mot. Summ.

J. Ex. 34, Questions.  The questions covered a variety of project, managerial, and performance issues

and called for considerable details.  For instance, the first question asked the plaintiff to describe the

Saginaw River crossing project including how may times the river was directionally bored, the

amount of labor involved, the cost of material, the amount of material that was "rejected or

abandoned," the cost of the abandoned material, and the cost of equipment.  *Ibid.*  The second

question requested  a description of "the Electric Utilities  role in the Golson and Cass Avenue Boat

launch projects." *Ibid.*  Bellman wanted to know who

> selected the style of lights, how much did those selected lights cost (total), what is
> the annual cost to operate the lights, is the electric division equipped to maintain
> those lights, where are the those lights typically installed, what is the complete height
> of the light fixtures, are we in a position to reach the height of the lights to replace
> the bulbs, has the fire department ever been used to assist in the operation/
> maintenance of these lights, what is the cost comparison of these lights to other lights
> currently used within the city, was the cost of these lights budgeted, was a budget
> transfer required to cover the cost of these lights or other contemplated work because
> of these lights, and why were these lights chosen.

*Ibid.*

The third question asked the plaintiff to explain the fiber optic project between City hall and

the electric facility and specifically the cost estimates that the plaintiff received.  *Ibid.*  The fourth

question asked the plaintiff about the purchase and implementation of a new radio system for the

electric department.  *Ibid.*  The fifth question sought an explanation about the security measures in

place at the electric department. *Ibid.* The sixth question requested an explanation of the 26th Street substation problem and how the plaintiff handled it. *Ibid.*

Questions seven and eight dealt with the plaintiff's relationship with his subordinates and business partners such as Consumers Energy. *Ibid.* Question nine asked the plaintiff to explain his maintenance program including cost and frequency. The tenth question dealt with the plaintiff's budgeting including allocations for overtime. The eleventh question wanted an update on a project with Consumers Energy called "Uptown at River's Edge." *Ibid.* Question twelve asked the plaintiff to describe his workweek including time spent running personal errands. *Ibid.*

Question thirteen concerned the Menard's project and the budgeting process involved. Question fourteen asked about the plaintiff's procurement procedures including acquisition of utility poles. *Ibid.* Question fifteen sought an explanation of the "Purchase Power Contract" and the impact of the contract on the "bottom line" of the electric utility. *Ibid.* In the sixteenth question, Bellman inquired whether the City had tendered bids on "directional bore projects" outside of the city and whether it is legal to use city equipment outside of its intended purposes. *Ibid.*

Question seventeen asked the plaintiff what equipment had been purchased specifically for his use and why any upgrades were made. *Ibid.* Question eighteen sought an assessment of the plaintiff's relationship with the City commission. *Ibid.* The nineteenth question concerned the plaintiff's involvement with the City's computer information system and whether he had used it for illicit purposes such as monitoring employee's communications or for personal use. *Ibid.* Question twenty asked the plaintiff if he had sent inappropriate emails including pictures or jokes to other employees. *Ibid.* Question twenty-one dealt with the plaintiff's memberships in professional organizations or associations and his role in such organizations. *Ibid.* In question twenty-two,

-12-

Bellman asked the plaintiff to explain any occasion on which the plaintiff had shown up to a work site intoxicated or consumed alcoholic beverages during the workday including lunch. *Ibid.*

Question twenty-three asked the plaintiff to describe educational seminars he attended. Question twenty-four concerned the plaintiff's relationship with other colleagues and how he would characterize those relationships. *Ibid.* Question twenty-five sought an explanation for a City commission item authorizing the hiring of Alliant Energy and what that company was to do for the City along with the cost. *Ibid.* Finally, question twenty-six asked the plaintiff whether he used a city employee to drive him around the city. *Ibid.*

The plaintiff responded in writing to each of the twenty-six questions. The incisive nature of the inquiry apparently caused the plaintiff some concern for his job, which was sensible in the wake of the devastating evaluation from Palenick. The plaintiff requested a copy of his personnel file on December 9, 2002.

However, the plaintiff continued in his job for another year. On November 21, 2003, Bellman presented the plaintiff with a final performance review, which was not positive. Under the category of job knowledge, Bellman wrote:

> Eric has failed to demonstrate an understanding of the electric business, the City's direction, professional handling of matters and compliance with City ordinances, policies and procedures. Eric's lack of understanding has added to overall cost of operations and delay in completion of projects and other matters. For example,
>
> 1. Confusion & Mess with CMS & CPS – unethical approach to break contract with CMS by demanding performance bond – violation of Purchase Power Agreement.
>     a.   Took too long after GDS completed its review of CPS financial information to complete the assignment of the Purchase Power Agreement from CMS to CPS. Request for CPS financial was made on 2/12/03; hired GDS on 4/7/03 and approved assignment on 11/17/03.
>     b.   Attempted to identify who was responsible for "congestion" charges when current contract did not include costs and City Attorney advised us what the City's position would on this issue

-13-

    c. After being advised that the City would only need to adopt a resolution authorizing the assignment, you attached a letter from CMS/CPS regarding the assignment which was not in the City's best interest

    d. Attempted to cancel contract with CMS by demanding a performance bond when he knew CMS was not in a position to issue a performance bond and failed to identify other means of ensuring fulfillment of contract terms (Email of 1/23/03)

2. Pole Attachment Agreement

    a. Took too long in completing review of and making language changes for the Pole Attachment Agreement

    b. Unable to successfully communicate to and resolve issues with Bay City Public Schools, Charter Communications and SBC relative to Pole Attachment Agreement.

    c. Recommended complete overhaul of Pole Attachment Agreement when such action was unnecessary.

3. Response to City Commission Vague

    a. Alternate Power Source – failed to provide clear understanding and direction, stressed urgency with CMS financial situation to find an alternate source. Contract with Alliant Energy on 8/21/02; inquiry of status on 1/6/03; and submission of Commission recommendation on

    b. MISO agreement

    c. Fails to answer questions directly at City Commission meetings and staff meetings

4. Violations of Code of Ethics – Unfamiliar with Code of Ordinances

    a. Bay Harbor attendance

        Attempted on two occasions to attend a fully funded conference at Bay Harbor, sponsored by CMS and CPS which violates City's Code of Ethics Ordinance.

        Request to send six employees to Oklahoma at the full cost of the vendor bidding on the directional bore machine.

        Maintains track record of violating the City's Purchasing Ordinance – constantly submitting emergency purchases and submitting purchase orders to Purchasing after the fact

        Requested to remove himself from the selection of Electric Rate Study consultant because of his communication with Alliant Energy which created a conflict of interest and a breach of duty

    b. Use of City equipment and resources for personal gain (ladder, ground rod, IS @ Studio 23)

5. Purchase Power Agreement

-14-

     a.  Mislead City Commission on overall financial impact – lacked clear understanding of the impact

     b.  Unfamiliar with financial impact on the City.  Recommended to the City Commission its approval based on a 3 percent annual increase when the increase was actually twenty and a half percent.

     c.  Recommended that the Purchase Power Agreement when Time of Day Provision was not addressed.  Accepted CMS statement if made, that they would address the issue after contract approval.

6.  Cost Estimates

     a.  Mendards – inaccurate, failed to have contract approved by City Commission – unusual customer – upgrade

     b.  Four Mile Project

     c.  Unfamiliar with how to accurately calculate, analyze, and clearly communicate the financial cost of providing new customers (Menards, Four Mile Project).

7.  Time of day meter upgrade – introduced and recommended a $25,000 upgrade to TOD meters based on a proposed savings to the City.  After Commission decision to table the request (9/23/02), a more thorough review revealed that this upgrade would cost more.

8.  Post 26th Street Substation Outage Inspection Program – instituted a pole by pole inspection after the 26th Street Substation failure (due to lighting storm and squirrel). This approach is unusual, created undue exposure to the City, and made unnecessary upgrades.  This program resulted in the purchase of unnecessary equipment and incurred excessive overtime.

     a.  Purchase & Installation of squirrel guards

     b.  Line x-ray devise – emergency device

9.  Unfamiliar with operations of own organization – pole attachments (Charter, SBC)

     a.  Overall, lack of ability to confidentially demonstrate knowledge and understanding fo the changing electric market and to convey those changes and their potential impact through sound, well though-out recommendations.

Pl.s' Resp. Br. Ex. D, Evaluation (9/21/03).  As a result, the plaintiff received an unsatisfactory rating.

     The evaluation rated other aspects of the plaintiff's job performance.  In terms of communication, Bellman wrote that "[w]ritten documents are typically incomplete, unclear and, at

times, offensive." *Ibid.* Bellman also commented that the plaintiff provided "long unrelated responses [to specific questions] which fail to answer the questions. As a result, you have created an environment lacking in trust and confidence." *Ibid.* The evaluation also noted that the plaintiff "lied three times to the City Commission. You received two days off for lying to the City Commission about why we were hiring a consultant to identify an alternate power source." *Ibid.*

With respect to the plaintiff's supervisory ability, Bellman again gave the plaintiff an unsatisfactory score. He noted in the evaluation that "Eric lacks the ability to effectively provide leadership. He has threatened to terminate several employees (Prevost & Newton). Likewise, Eric has created an unhealthy environment within the electric department." *Ibid.* The evaluation also stated under the category "Adaptability/ Problem Solving Skills" that "Eric lacks the ability to think creatively and grasp instructions, which is evident in the number of mistakes he made." *Ibid.* According to Bellman, the plaintiff "created a strained relationship with Consumers Energy, Charter Communications and Bay City Schools." *Ibid.*

The plaintiff's performance on the topic of "Quality and Dependability of Effort" similarly was unsatisfactory. *Ibid.* The evaluation commented that the plaintiff constantly missed deadlines resulting in delaying of the completion of projects. The plaintiff failed to adequately supervise and review work of employees to whom he assigned work. The plaintiff's quality and effectiveness of effort was rated as unsatisfactory "[d]ue to constant errors and inaccurate information[.]" Bellman commented that the plaintiff "has failed to make sound decisions and as a result he has cost the City more money." *Ibid.* Further, the plaintiff sought guidance on such basic matters as writing letters, misused the City attorney, and "constantly wants to blame someone else for his mistakes or lack of

attention to details." *Ibid.* As a result, he was given a score of unsatisfactory on his decision making

skills. *Ibid.*

The plaintiff's performance of his budget and cost control duties as a department head

likewise were unsatisfactory.

> Eric has failed to manage his department and its limited resources. Eric does not
> adequately plan, communicate and budget the departments [sic] priorities. Likewise,
> Eric is not cognizant of proposed developments that may require an investment from
> the Electric department. He has failed to put into place the proper procedure to
> address these deficiencies. He uses the excuse that it's the "nature of the business".

*Ibid.* Finally, with respect to "Co-Operation/Sensitivity" the plaintiff received another score of

unsatisfactory. The evaluation recorded that "Eric has created strained relationships with

Consumers Energy, Charter Communications, SBC, and Bay City Schools. He does not

communicate the issues in a professional manner." *Ibid.* Based on evaluation, Bellman

recommended termination. *Ibid.*

Bellman presented this evaluation to the plaintiff in person. Dean discussed the lengthy

document with Bellman for about ten minutes, during which time he challenged several of the

allegations. At the conclusion of the meeting, Bellman terminated Dean's employment with the

City. He followed the termination with a confirmatory letter that advised Dean of his right to file

a grievance and proceed to arbitration. On December 8, 2003, the plaintiff met again with Bellman

as part of the grievance process so he could proceed to arbitration. The plaintiff described the

meeting as follows:

> Q.    How long did the meeting take?
> A.    Five minutes.
> Q.    What did Mr. Bellman say?
> A.    He sat down notebook in tow ready to, I guess, record my pleas for
>       reinstatement. And my response was, was that I was there to fulfill the
>       process. That it's somewhat laughable that the very man that fired you,

-17-

> you're going to appeal to that very same person to get your job back . . . . So I fulfilled my obligation pursuant to the policy and showed up and indicated that I was going to go to arbitration with it.
>
> Q.    So you didn't present any specifics regarding your beliefs regarding your termination, correct?
>
> A.    No.
>
> Q.    Because you thought it would be futile?
>
> A.    No question about it.

Dean dep. at 466-67. The plaintiff acknowledged that he, in fact, demanded arbitration, but later withdrew his request on the advice of counsel. He also stated that he could not afford arbitration.

On May 3, 2004, the plaintiff filed a complaint in this Court, which subsequently was amended on July 15, 2004. The plaintiff attempted to amend his complaint a second time, but the Court denied the motion on October 28, 2005. As amended, the complaint alleges a violation of due process, via 42 U.S.C. § 1983, based on the procedures employed in terminating him against the City defendants (count one); retaliation in violation of the First Amendment for alleged comments he made implicating public interest and for which he claims he was discharged via section 1983 against the City defendants (count two); breach of contract under Michigan law against the City defendants (count three); tortious interference with a business relationship under Michigan law against all defendants (count four);  violation of Michigan's Freedom of Information Act (count five); defamation *per quod* and *per se* under Michigan law against defendant Palenick and the defendant City (count six); defamation *per quod* and *per se* against defendant Bellman and the defendant City (count seven); intentional infliction of emotional distress under Michigan law against all defendants; and a claim by the plaintiff's wife (also a named plaintiff) for loss of consortium (count nine).

Thereafter, the defendants filed motions for summary judgment to which the plaintiff has responded.

II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148  (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292,

-19-

296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A.

The defendants first attack the plaintiff's procedural due process claim by contending that the plaintiff was not entitled to much of a pre-termination process because he was an at-will employee, and he waived his claim with respect to a post-termination procedure when he withdrew his demand for arbitration.  The plaintiff disputes the characterization of his employment term as "at-will," insists that he was a "just-cause" employee, contends he had no meaningful pre-termination hearing, and argues that he could not afford arbitration (which would have been futile, according to him, anyway) and therefore he had no meaningful post-termination hearing.

The Fourteenth Amendment to the Constitution prohibits State and local governments from "depriv[ing] any person of life, liberty, or property, without due process of law[.]"  Federal courts consistently have recognized that state civil servants may have a property interest in continued employment under certain circumstances and must be afforded due process before being discharged. *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1986); *Relford v. Lexington-Fayette Urban County Government*, 390 F.3d 452, 460 (6th Cir.  2004) (stating that "[u]nder state law, government and civil service employees may have a property right in their continued employment"). A claimed due process violation is analyzed in two steps.  First the court must determine whether a protected property interest exists; absent an interest, no right to due process  is present. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 565 (6th Cir. 2004).  The second step, if the first is answered in the affirmative, poses the question of what process is due. *Ibid*; *see also Johnston-Taylor v. Gannon,* 907 F.2d 1577, 1581 (6th Cir. 1990).

-21-

1.

The formality of the process due under federal law "depends upon the importance of the [property] interest" at stake. *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004). The Supreme Court has recognized that a municipal employee can have a property interest in continued employment; however, such "property interests are not created by the Constitution[;] 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . .'" *Loudermill*, 470 U.S. at 539 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Generally, a showing that a civil servant may be fired only for cause, by operation of state contract law, statute, or administrative rules and regulations is sufficient to trigger the second step of the analysis. *Farhat*, 370 F.3d at 595.

Michigan law provides three methods by which a plaintiff can prove he is a "just cause" employee: "(1) proof of 'a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause;' (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a 'legitimate expectation' of job security in the employee." *Lytle v. Malady (On Reh)*, 458 Mich. 152, 164, 579 N.W.2d 906, 911 (1998). In this case, the parties agree that the plaintiff can point to no contractual provision guaranteeing just cause termination. Nor has the plaintiff produced any evidence of an express written or oral agreement. However, the Court believes that the plaintiff has come forward with evidence that creates a fact question as to the City's policies and procedures creating a legitimate expectation of a secure job that would not be withdrawn absent just cause.

For instance, James Palenick, the former city manager, testified to his understanding that "fairness would dictate that you would only terminate people for cause." *See* Palenick dep. at 17. In addition, the plaintiff presents his own deposition testimony that he was assured by Palenick of secure employment. *See* Pl.'s Resp. Br., Dean dep. at 11 (testifying that based on his conversation with his supervisor, the plaintiff "knew . . . I was a just cause employee" as that term was "defined by my supervisor"). Moreover, the City's employment manual established a detailed grievance procedure in which employees could challenge decisions to terminate. The procedure, before it was amended, provided for an elaborate right to a hearing before the city commission. The existence of such a procedure is wholly inconsistent with an employer's privilege of discharging employees at will. The amended procedure promulgated in November 2002 preserved the right of grievance and truncated the process. But the language specifically excepted "the City Manager, who is an at-will employee under the City Charter and Come Rule Cities Act, or to any other 'at-will' employee of the City." Def.s' Mot. Summ. J. Ex. 52, Resolution (Nov. 18, 2002). The defendants offered Dean the right of grievance to be followed by arbitration, which would have been unnecessary if he were considered to be an at-will employee. The Court concludes for the purpose of this motion, therefore, that the plaintiff was a just-cause employee.

## 2.

The determination that the plaintiff could be fired only for just cause, however, does not lead automatically to the plaintiff's conclusion that he was entitled to a pre-termination hearing before a neutral arbiter. Sixth Circuit precedent makes clear "that in the pretermination stage, the employee does not have a right to, and the Constitution does not require, a neutral and impartial

decisionmaker.  The 'right of reply' before the official responsible for the discharge is sufficient." *Farhat*, 370 F.3d at 595.

In *Bucnker v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990), the Sixth Circuit held that due process before termination means "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer." To require more than notice and a "right of reply" prior to discharge "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Farhat*, 370 F.3d at 595.  (internal citations and quotations omitted).  The purpose of the pretermination hearing "is to provide an initial check against mistaken conclusions, 'essentially a determination of whether there are reasonable grounds to believe that charges against the employee are true and support the proposed action.'" *Ibid.*  At the pre-termination stage, "the elements required for due process are notice and an opportunity to respond." *Ibid.*

The plaintiff received this measure of due process in abundance.  He was given explicit, detailed notice of his job performance deficiencies more than a year before he ultimately was fired, and he was encouraged to respond in writing to the twenty-six questions.  Dean's termination was recommended by two different city managers.  Before he was fired, he met with Robert Bellman and was given a lengthy summary of his performance flaws.  The plaintiff responded to Bellman's criticism and challenged several items.  The undisputed facts establish that the plaintiff was given a constitutionally adequate pre-termination process.

The Court likewise must reject the plaintiff's contention that he was deprived of a meaningful post-deprivation hearing.  Dean met with Bellman to grieve his termination; that process did not measure up to the required hearing before a neutral fact finder contemplated by federal

-24-

precedents. *See Loudermill*, 470 U.S. at 545; *Duchesne*, 849 F.2d at 1006; *Buckner*, 901 F.2d at 494.

However, the City's rules provided:

> Arbitration: Any employer whose employment is terminated may elect to submit the matter to arbitration. Only termination decisions can be submitted to arbitration. The employee must have followed the grievance procedure in its entirety before being eligible to file for arbitration of the termination decision. The claim shall be submitted to the American Arbitration Association or related agency and the Human Resources Department with in fifteen (15) days following the decision of the city manager or his/her designee. The costs of arbitration shall be shared equally between the parties, and proceedings shall be governed by the by the Labor Arbitration Rules of the American Arbitration Association or related agency. . . . The scope of review is that the arbitrator shall be limited to the review of the facts and circumstances to determine whether or not the conduct alleged has a reasonable basis in fact.

Resolution (Nov. 18, 2004). Dean had the opportunity to proceed to arbitration before a neutral decision maker, but he withdrew his arbitration demand. As the court of appeals explained:

> The law is well-established that it is the opportunity for a post-deprivation hearing before a neutral decisionmaker that is required for due process. As long as the procedural requirements are reasonable and give the employee notice and an opportunity to participate meaningfully, they are constitutionally adequate. *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998). As succinctly stated by the Seventh Circuit, the "availability of recourse to a constitutionally sufficient administrative procedure satisfies due process requirements if the complainant merely declines or fails to take advantage of the administrative procedure." *Dusanek v. Hannon*, 677 F.2d 538, 542-43 (7th Cir. [1982]). Consequently, where the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim. *See Krentz v. Robertson Fire Prot. Dist.*, 228 F.3d 897, 904 (8th Cir. 2000) (citations omitted).

*Farhat*, 370 F.3d at 596.

The arbitration procedure was optional, but Dean had the right to elect it. Like the plaintiff in *Farhat*, when Dean chose not to participate in post-termination arbitration, he waived whatever remained of his procedural due process claim.

-25-

### B.

The defendants argue that the plaintiff has not pleaded or supported a viable First Amendment retaliation claim. They contend that the plaintiff has failed to show that he was engaged in constitutionally protected speech or that the exercise of speech was a substantial or motivating factor in the decision to terminate him. The plaintiff did not respond to these arguments in his motion papers.

The Sixth Circuit has provided differing iterations of the elements of a First Amendment claim under section 1983. *Compare Farhat*, 370 F.3d at 588 (requiring proof of constitutionally protected activity, adverse action, and causation) *with Rodgers*, 344 F.3d at 596 (requiring proof that speech addressed a matter of public concern, balancing the public employee's interest in speech against the government employer's interest in promoting efficiency, and a showing that speech motivated some adverse action against the public employee). These formulations are not necessarily inconsistent but rather organize the components of a First Amendment claim differently. The Court finds the formulation stated in *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000), to be useful:

> A public employee who would succeed on a claim of retaliation in violation of the First Amendment must demonstrate (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quotation omitted); *see also Mt. Healthy*, 429 U.S. at 287.

*Ibid.*

-26-

The first element, whether the plaintiff's speech was a constitutionally protected activity, is divided into the two sub-elements referenced in *Rodgers*.  The first sub-element of the test – "whether the relevant speech addressed a matter of public concern," *Rodgers*, 344 F.3d at 596 – seeks to draw a line between issues "relating to any matter of political, social, or other concern to the community," *Connick v. Myers*, 461 U.S. 138, 146 (1983), and those that largely reflect the "quintessential employee beef" about incompetent or insensitive management. *Jackson v. Leighton*, 168 F.3d 903, 911 (6th Cir. 1999).  The second sub-element invokes the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), calling upon the court to determine whether the employee's interest in speaking as he did outweighed the defendants' interests in keeping him silent. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Connick*, 461 U.S. at 147-50). The factors to be considered in weighing the parties' respective interests include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

At oral argument, the plaintiff responded affirmatively to the Court's inquiry whether he wished to pursue his First Amendment claim in light of his failure to answer the defendants' motion arguments.  However, the lack of a response leaves the Court little to analyze.  The plaintiff has not met his burden in a summary judgment motion, that is, to point to facts in the record demonstrating the presence of a genuine issue of material fact. There is "no duty imposed upon the trial court to search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 404 (6th Cir 1992) (quoting *Street*, 886 F.2d at 1480).

-27-

Although silence in the face of a summary judgment motion does not constitute abandonment of a claim or defense as such, it amounts to a failure to fulfill the obligation to "designate" the "specific facts showing there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. That failure is indulged at the mute party's peril: "This burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden – for example, by remaining silent – its opportunity is waived and its case wagered. *Guarino*, 980 F.2d at 405.

Even if the Court were to give the plaintiff the benefit of the doubt by concluding that his various comments in the press concerning his disagreement with the city commission over power generation, outages, and the profitability of the public utility, the Court cannot find evidence that any of these comments played the slightest role in the plaintiff's termination. The plaintiff presents no evidence that Bellman took action against him because of the plaintiff's speech, which occurred more than a year before his termination. The plaintiff testified at his deposition that he never raised he matters of public concern with Bellman because "he wasn't a player at that time. He was a Director of Environmental Activities." Dean dep. at 314. The plaintiff could not say why Bellman would retaliate against him. *See id.* at 181 (testifying "[f]or some reason that I still do not know, Mr. Bellman had cause to design a scenario that would result in my termination"). Protected speech was not mentioned by the plaintiff as a possible reason. The plaintiff has failed to identify evidence of a causal link that his termination was substantially motivated by protected speech, and review of the record does not suggest such a link. Furthermore, the defendants provide ample evidence the plaintiff would have been terminated anyway, as the final evaluation makes clear. The defendants are entitled to judgment as a matter of law on the plaintiff's First Amendment retaliation claim.

C.

The claims of co-plaintiff Elizabeth Dean are based on loss of consortium. The Sixth Circuit has held that section 1983 does not permit a loss of consortium claim because "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000). Since "only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim," "no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Ibid.* Therefore, the plaintiffs' remaining claims, including the consortium claim, arise exclusively under state law.

The Court has subject matter jurisdiction over the state law claims under the supplemental jurisdiction statute because those claim form part of the same controversy as the due process claim. *See* 28 U.S.C. § 1367(a). However, Section 1367 also provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over the state law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). Thus, pursuant to this Section 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over state law claims in this case. *Weeks v. Portage County Executive Offices,* 235 F.3d 275, 279 (6th

-29-

Cir. 2000) (observing that section 1367(c) "permit[s] the district court to decline to exercise supplemental jurisdiction when that court has dismissed all of the claims over which it has original jurisdiction").

The remaining causes of action are based on theories of breach of contract, tortious interference with a business relationship, violation of Michigan's Freedom of Information Act, defamation, and intentional infliction of emotional distress. The defendants have raised defenses of absolute and governmental immunity, and the statute of limitations. These claims and defenses require the application of state law that in some instances is unsettled. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Amer. v. Gibbs*, 383 U.S. 715, 726 (1966). The dismissal of the claim over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Blakely*, 276 F.3d at 863.

The Court believes that it is appropriate to decline the exercise of supplemental jurisdiction over the state law claims now that the plaintiffs' federal claims will be dismissed. Those claims, therefore, will be dismissed without prejudice.

### III.

The Court finds that the plaintiff has not brought forth evidence to establish material fact questions on all the elements of his federal claims. The defendants are entitled to a judgment as a matter of law as to those counts of the complaint. The Court will decline jurisdiction as to the remaining claims.

Accordingly, it is **ORDERED** that the defendants' motions for summary judgment [dkts # 52, 57] are **GRANTED IN PART and DENIED IN PART**.

It is further **ORDERED** that counts one and two of the plaintiffs' amended complaint, alleging claims under 42 U.S.C. § 1983, are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the remaining counts of the amended complaint are **DISMISSED WITHOUT PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: December 30, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 30, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS